**KANARR CORPORATION**

v.

**The UNITED STATES.**

No. 92–67.

United States Court of Claims.

July 16, 1969.

I. H. Wachtel, Washington, D. C., attorney of record, for plaintiff; Stuart A. Goldstein, Washington, D. C., of counsel.

Donald T. Fish, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller, Joseph Kovner and Michael I. Saltzman, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, and SKELTON, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on May 12, 1969. Plaintiff has filed no notice of intention to except to the commissioner's

report and the time for so filing pursuant to the rules of the court has expired. On June 16, 1969, the defendant filed a motion that the court adopt the opinion, findings of fact and recommended conclusion of law filed by the commissioner as those of the court.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

HOGENSON, Commissioner:

This is an action to recover occupational taxes assessed and paid for the fiscal years ending in June of 1962 through 1967, plus interest and penalties thereon. The issue is whether plaintiff, Kanarr Corporation (Kanarr), is a manufacturer of "firearms" and thus subject to the $500 occupational tax imposed by § 5801[1] for each year. It is my opinion that plaintiff is not entitled to recover.

Kanarr, a Pennsylvania corporation, has, since 1962, produced under contracts with the Department of the Army certain weapons designated as M–79 Grenade Launchers (hereinafter M–79). The Department of the Army has been plaintiff's only customer for the M–79. It has manufactured no other weapons.

The M–79 has the outward appearance of a single, wide-barreled, sawed-off shotgun or carbine. It is a single-shot, trigger-operated, break-open, breech-loading weapon. Its barrel is 14 inches in length, and its overall length, 28.78 inches.

Plaintiff utilizes two main arguments. First, it asserts that the M–79 does not fall within the statutory definition or purview of weapons which subject their manufacturers to the pertinent occupational tax. Second, it argues that this question need never be reached in this case because plaintiff is exempt from assessment and payment of such tax as a matter of law.

■ Consideration is first given to the threshold issue. Plaintiff has manufactured the M–79 solely for defendant, and has not manufactured any other type of weapon. Plaintiff's position is that the overall policy and intent of Congress was to exempt any such manufacturer from all taxes imposed by the National Firearms Act, of which the occupational tax is part. It argues that it is exempt from the *occupational tax* because the *transfer tax* imposed by § 5811 is by § 5812 made expressly not applicable to transfers of firearms to defendant, and because the tax on *making firearms* imposed by § 5821(a) is by § 5821(b) made expressly not applicable to a person engaged within the United States in the business of manufacturing firearms, or to the making of firearms for the use of defendant. However, these express exemptions on transfers and making of firearms do not reasonably justify the conclusion that Congress intended to exempt from the special occupational tax any manufacturer who happened to make firearms solely for the United States.

It is significant that § 5801 imposes the occupational tax on "every" manufacturer, without any qualification or exemption being stated as to the person taxable. Congress had demonstrated within the framework of the National Firearms Act that it well understood how to provide (and addressed itself to providing) an express exemption as to certain types of taxes, and it is reasonable to conclude that had Congress intended an exemption in the category of the occupational tax, it would have made some mention of such an intention.

Moreover, in 1968, Congress did what plaintiff contends was originally intended, *i. e.*, enacted new § 5851 providing

---

1. All code citations refer to the Internal Revenue Code of 1954.

that any person required to pay special (occupational) tax under § 5801 shall be relieved from payment of that tax if he establishes to the satisfaction of the Secretary of the Treasury, or his delegate, that his business is conducted exclusively with, or on behalf of, the United States. P.L. 90–618, 90th Cong., 2d Sess., approved October 22, 1968, 82 Stat. 1213, 1233. The Senate Report submitted for the enactment of § 5851 stated with respect thereto: "This section is new. It makes specific provision for excepting operations conducted on behalf of the United States." S.Rep. 1501, 90th Cong., 2d Sess., 1968–47 Cum.Bull. 52, 79.

It is concluded that plaintiff was not exempt from the occupational tax during the years involved in suit.

█ On the issue as to whether or not the M–79 is a firearm within the meaning of § 5801, imposing the occupational tax on a manufacturer, importer, or dealer of firearms, the dispute between the parties revolves around the definition of the term "rifle." In this connection, the term "firearm," as used in § 5801, is defined in § 5848(1) as including *inter alia* a "rifle having a barrel of less than eighteen inches in length," and the term "rifle" is defined in § 5848(3) as follows.

> (3) Rifle. The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

Section 5801 is part of the National Firearms Act, first enacted in 1934, 48 Stat. 1236, as was the predecessor of § 5848. However, the limited definition of "firearms" was expanded in the enactment of § 5848 as a part of the Internal Revenue Code of 1954, 68A Stat. 726. The above-quoted definition of "rifle" was one of the additions, others

being definitions of a "shotgun" and of the term "any other weapon." In explanation of the changes proposed and accomplished in § 5848, the pertinent committee reports of Congress, 3 U.S.Cong. & Adm.News (1954), pp. 4542, 5209, stated as follows:

\* \* \* \* \* \*

\* \* \* These new definitions are needed for the reason that Congress did not define such weapons when the National Firearms Act was enacted in 1934 although it did define "machine gun." Since Congress did not define these weapons it has been necessary to use the ordinarily accepted definitions thereof appearing in acceptable, standard dictionaries. In so doing, and because of a technical application of the definition of the term "firearm," as it appears in the present statute, many weapons firing projectiles by the action of an explosive have been brought within the scope of the National Firearms Act although it is believed the Congress did not intend that such weapons should be included. For example, under a technical interpretation of the term "firearm," blunderbusses, muzzle-loading shotguns, and other ancient or antique guns have been considered subject to the National Firearms Act and in many instances the requirements thereof have been imposed. As a result of these interpretations, over a period of years, restrictions have been imposed on a certain class of persons, namely, antique gun collectors, and it is felt that these restrictions should be removed in pursuance of the clearly indicated congressional intent to cover under the National Firearms Act only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters. Moreover, for proper administration of the National Firearms Act it is considered highly proper and desirable that the Congress define the terms "rifle," "shotgun," and "any other weapon" so as to

remove any doubt as to the type of firearms which Congress intended to bring within the scope of the National Firearms Act.

Thus, it was made plain that Congress expected that this legislation would cover any type of modern and lethal weapon, except pistols and revolvers, which would be readily and efficiently used by the underworld.

Plaintiff's position is that the M–79 does not meet two parts of the statutory definition. First, plaintiff expands the literal language "designed * * * made * * * and intended to be fired from the shoulder" to mean "exclusively" from the shoulder. The range of the M–79 is 31 to 400 meters.

At distances of less than 150 meters, the firer of the M–79 holds the butt of the weapon against his shoulder, and aligns the sights on the target. The front sight is fixed, but the rear sight is adjustable, with such sight being raised higher on a gauge as the range increases. To maintain sight alignment, the butt is in lower position as the range increases. For intermediate distances, the firer lowers the position of the stock on the shoulder, or drops the butt (as the range increases) from the shoulder. At near maximum ranges, the stock is positioned between the waist and the armpit and held firmly into the body by the upper arm. From the prone or sitting position, the M–79 is fired with the butt against the shoulder, or resting on the ground, or placed against an object, depending upon the sight alignment requirements.

Plaintiff's justification of the meaning "exclusively" is that rifles, as they are commonly known, are always intended to be fired from the shoulder if accurate sighting is to be maintained. However, in view of Congress' expressed policy of covering such weapons as could be readily and efficiently used by criminals or gangsters, plaintiff's construction does not seem well taken. The gangster or criminal need not be able to utilize a weapon to its fullest potentiality for it to be a menace to society. The ability to utilize the M–79 effectively through most of its range by shoulder fire action clearly constitutes the type of threat meant to be met by the statute.

Regarding the second part of the statutory definition, plaintiff argues that the specific standard of the statute is not met, contending that the M–79 does not fire (in the words of the statutory definition) "only a single projectile" for each single pull of the trigger. The M–79 is designed for 40-mm ammunition of the fixed type, i. e., the primer, propellant charge and projectile (grenade) are assembled in a cartridge case which is loaded as a single unit. The M–79 fires a standard high explosive round and a practice round. It also fires individually a series of signaling and illuminating rounds, a tear gas round, and a multiple projectile round. The multiple projectile round is held together by a single carrying case called a "sabot". This projectile leaves the muzzle of the weapon as a unit in the sabot, but the wind resistance to the sabot dislodges the projectiles that are contained therein. Those travel down range separately and become the lethal mechanisms.

Plaintiff's position is that the multiple projectile round is really equivalent to several separate projectiles tied together and should not be considered a "single projectile." The statutory wording plaintiff relies upon is incomplete. Rather than simply limiting one characteristic of a rifle to a weapon which fires "only a single projectile," the full description is of a weapon designed "to use the energy of the explosive to fire only a single projectile *through a rifled bore* for each single pull of the trigger." [Emphasis added.] The statutory requirement is that the projectile be a unit as it leaves the muzzle. Had Congress chosen to preclude the firing of a single projectile which becomes multiple after leaving the barrel of the weapon, it would have made "rifled bore" a separate element of the descriptive language,

rather than using such words as part of an operative process. The evidence is clear that the multiple projectile round is a single projectile as it leaves the muzzle of the M–79 and remains such for a distance of 10 feet.

Plaintiff's second general argument is that even if the M–79 falls within the literal scope of the statute, its characteristics are so different from what is commonly considered a "rifle" as to demonstrate that Congress never intended the M–79 to be covered by the occupational tax statute.

First, plaintiff points out correctly that the aluminum barrel of the M–79 cannot withstand the heat that would be generated from the velocity of a normal rifle bullet. Second, although the rifling of the barrel of the M–79 serves the basic purpose of providing accuracy of flight of the projectile, by preventing the projectile from tumbling after it leaves the muzzle, the spinning action imparted by the rifled bore is also utilized to arm the fuze of the high explosive projectile. Finally, plaintiff argues that since the grenade explodes on impact, producing lethal fragments, the M–79 is not an ordinary rifle which ejects nonexplosive projectiles.

Had Congress not provided a specific definition of "rifle," plaintiff's arguments would have force. Plaintiff might then have relied upon "the ordinarily accepted definitions * * * appearing in acceptable, standard dictionaries," language which was used in the committee reports quoted above. However, Congress rejected this approach, and provided its own statutory definition. The M–79 fits the letter and spirit of such definition. It is the type of weapon which the underworld could utilize, whether obtained lawfully or unlawfully, and it is a lethal weapon, far different from the "blunderbusses, muzzle-loading shotguns, and other ancient or antique guns," which Congress removed from the provisions of the National Firearms Act.